UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SHANNON T. HARRIS,

      Plaintiff,

v.                                                        ACTION NO.
                                                        2:04cv513

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

**UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3) seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.

      This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. The Court recommends that the final decision of the Commissioner be AFFIRMED.

**I. PROCEDURAL BACKGROUND**

      On June 15, 2001, Shannon T. Harris ("Ms. Harris") filed an application for disability insurance benefits and an application for supplemental security income with the Department of

Health and Human Services of the Social Security Administration. (R. 84-86, 248-250).[1] She alleged an onset of disability as of January 1, 2000 due to "developmental delays," kerataconis requiring cornea transplants of both eyes, asthma, allergies, and sickle-cell trait. (R. 109). The applications were denied by the Social Security Administration initially and upon reconsideration.(R. 55-57, 251-54).

Ms. Harris requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration which was held on July 2, 2002, before ALJ William Vest. (R. 266-302). She was represented by John Klein at the hearing. (R. 266). Ms. Harris, Ms. Harris' mother Gloria Harris, and a vocational expert testified at the hearing. On September 9, 2002, the ALJ issued a decision finding Ms. Harris was not entitled to benefits as she was able to perform her past relevant work. (R. 41-51). On May 28, 2003, the Appeals Council of the Office of Hearings and Appeals of the Social Security Administration vacated the hearing decision and remanded the case for additional evidentiary development and evaluation. (R. 77-79).

On September 3, 2003, a second hearing was held before ALJ O. Price Dodson, who considered the case *de novo*. (R. 303-327). Ms. Harris was again represented by John Klein at the hearing, and Ms. Harris, Ms. Harris' mother Gloria Harris, and a vocational expert testified. The ALJ issued a decision on November 5, 2003, finding Ms. Harris was not entitled to disability benefits because she is capable of performing a limited range of light work. (R. 14-24). The Appeals Council denied review of the ALJ's decision on June 24, 2004. (R. 7-9). This makes the ALJ's decision the "final decision" of the Commissioner subject to judicial review here, pursuant to 42 U.S.C. § 405(g).

---

[1] "R." refers to the administrative record.

Ms. Harris brought this action seeking review of the Commissioner's decision denying her claim for disability insurance benefits and supplemental security income. She filed a complaint on August 26, 2004, which the defendant answered on November 1, 2004. Ms. Harris filed a Motion for Summary Judgment with a memorandum in support on December 20, 2004, and defendant filed a Motion for Summary Judgment with supporting memorandum on January 19, 2005. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for decision based on the memoranda.

## II. FACTUAL BACKGROUND

Ms. Harris was a 26 year old woman at the time of the second hearing in this matter. (R. 307). Born October 30, 1976, she is presently 28 years old. (R. 84). She attended special education classes and graduated high school. (R. 18). She has held part-time jobs at Chick-Fil-A, Cinemark, Farm Fresh, Hardee's and the YMCA. (R. 18, 110).

### A. Medical Evidence in the Record

The ALJ found that Ms. Harris suffers from borderline intellectual functioning and systemic lupus erythematosus ("lupus"), impairments which cause significant vocationally relevant limitations. (R.18).

Ms. Harris was examined by Dr. Dorcas Zuniga on January 16, 2001, having been brought in for examination by her mother following a possible suicide threat. (R. 195). Ms. Harris' mother noted that Ms. Harris had exhibited both a "lack of motivation for awhile" and a history of suicidal thoughts, and that she had earlier been diagnosed with a learning disability and developmental delays. Although Ms. Harris had a depressed affect, she denied that she was depressed. Id.

On a referral from Dr. Zuniga, Ms. Harris was evaluated by a psychologist, Dr. Robert Seltzer, on January 30, 2001. (R. 203-204). Dr. Seltzer observed that Ms. Harris was alert and oriented in all spheres and demonstrated normal attention and concentration, a full range of affect, and below average intelligence. It was noted that Ms. Harris had been prescribed Paxil by Dr. Zuniga and had no prior history of psychiatric treatment. Dr. Seltzer entered a diagnosis of dysthymia,[2] and proposed a treatment plan inclusive of further intellectual testing, individual therapy, and a referral to the State for vocational rehabilitation. (R. 203).

On February 9, 2001, Dr. Seltzer performed an intellectual and academic evaluation of Ms. Harris, designed "to establish her learning potential and the need for a referral to the Virginia Department of Vocational Rehabilitation for a vocational assessment." (R. 200-201). Ms. Harris' tested I.Q. scores (75-verbal and performance, 74-full scale) fell within the borderline range of intelligence, and were interpreted by Dr. Seltzer as reflecting the potential for below average vocational and academic functioning and an inability to use more complex forms of reasoning. Dr. Seltzer additionally stated that Ms. Harris had a "rather short" attention span and limited task perseverance. Ms. Harris' reading ability was characterized as being at the 5th-6th grade level, and her mathematical ability at the 3rd grade level. Vocational training and coaching were recommended for further defining Ms. Harris' vocational potential, teaching job skills and positive work attitudes, and instilling greater motivation and self-confidence.

Subsequent counseling notes provided by Dr. Seltzer, spanning the months of February - July, 2001, indicate an improvement in Ms. Harris' symptoms of depression, feelings of self-esteem,

---

[2]Dysthymia refers to a depressed mood in which the symptoms are not severe enough to be characterized as major depression. Dorland's Illustrated Medical Dictionary 519 (28th ed. 1994).

mood, and activity level. Ms. Harris was repeatedly advised to look for appropriate work, and was reportedly excited about her upcoming participation in a vocational rehabilitation program. (R. 196-199). By her last reported examination, she was described as being "not depressed" and with an "improved" mood and "increased self-confidence." (R. 196-197).

Treatment notes by Dr. Zuniga during this same period similarly indicate an improvement in Ms. Harris' emotional state, although Ms. Harris was described by her mother as lacking in motivation and as being irregular in her use of prescribed medication. (R. 192-195).

Although Ms. Harris complained of right hand pain, x-ray testing revealed no sign of arthritis or other abnormalities. (R. 189). Based upon a positive result on ANA testing[3] (R. 190) and Ms. Harris' complaints of intermittent hand pain, Ms. Harris was referred by Dr. Zuniga to Dr. Albert Lee, a specialist in rheumatology. (R. 208-209). Ms. Harris denied that she experienced fatigue, muscle pain, depression or memory problems. Her July 20, 2001 physical examination was entirely normal, and there was no evidence of reflex, sensory, musculoskeletal, neurological or range of motion deficits and no "clear clinical evidence of systemic lupus erythematosus or a connective tissue disease on physical exam." However, Dr. Lee noted Ms. Harris "appears to have polyarthralgias and a positive ANA" requiring additional testing. (R. 209).

Based upon more detailed testing, Dr. Lee entered a diagnosis of systemic lupus erythematosus ("lupus"). (R. 243). Dr. Lee thereafter examined Ms. Harris on a quarterly basis from October 2001 through August 2003. (R. 232-241). Reports of his examinations during this period are rather consistent: with rare exceptions, Ms. Harris denied fatigue, weakness, or swelling,

---

[3] ANA testing measures the presence of antinuclear antibodies associated with rheumatic diseases. See http://arthritis.about.com/cs/diagnostic/a/bloodtests.htm.

demonstrated entirely normal results on physical examination, tolerated her prescribed medication well and without reported side effects, and with the exception of some pain in her right knee, experienced no symptoms from her lupus, with the latter being described by Dr. Lee as "quiet."

Upon a comprehensive review of all medical evidence then-extant, a series of State agency physicians, psychologists and psychiatrists opined in July, September and October, 2001, that Ms. Harris was capable of performing simple and routine work. (R. 212-230).

### B. Testimony in the Record

From February through December 2002, Ms. Harris participated in a residential program of vocational rehabilitation at the Woodrow Wilson Rehabilitation Center. (R. 132-147, 306). After an unpromising start marked by poor attendance, non-compliance with rules and poor motivation (R. 132-136), Ms. Harris' performance improved significantly, and she was reported to have done "extremely well" in food service training (R. 139-140), was "a really good student" in child care training (R. 141), and was viewed as having "the potential to make a good child care worker," despite periodic deficits in initiative, attendance, and motivation. (R. 144, 146).

Ms. Harris successfully completed the program, and was certified in child care. She worked approximately five 30-hour weeks as a substitute teacher's assistant at a YMCA in the spring of 2003, until the program's closure for the summer. (R. 148-155, 306). In that position, Ms. Harris' responsibilities included reading to the children, preparing meals, and assisting other teachers. (R. 309). At her administrative hearing, Ms. Harris testified that she was extremely fatigued over this five-week period, and would come home in the evening, and sleep until the next day. (R. 318). She stated she often fell asleep after she put the children down for their nap. (R. 317). She also testified that she experienced a flare-up of her lupus as a result, and her mother described the flare-up as "a

little stiffness in her joints" and allergies. (R. 315, 323). Plaintiff stated she expected she would be called back to work when the program resumed in the fall. (R. 317).

When asked why she had been unable to keep a job for any length of time, plaintiff answered that she is unable to concentrate or take directions, and sometimes has trouble preparing for the day. (R. 313-14).

Ms. Harris was 27 years old at the time of the Commissioner's final decision (R. 87, 307), with a high school education (R. 308), post-high school training as a computer administrative specialist (R. 115), and a series of jobs which were held for short durations. (R. 110, 310). She voluntarily discontinued psychological counseling after completion of vocational rehabilitation and admitted that prescribed medication helped to relieve her symptoms of depression. (R. 314). She also denied using prescribed medication for pain relief. (R. 118). Although Ms. Harris' mother stated that Ms. Harris had problems in the areas of concentration and persistence, she admitted that Ms. Harris had demonstrated improvement in these areas and a greater degree of independence. (R. 321-322).

Ms. Harris stated that her impairments had not affected her ability to cook, shop, handle finances, or perform household chores. (R. 121). She admits that she sleeps well without the aid of medication. (R. 123). Describing her daily activities during the period relevant to this case, Ms. Harris indicated that (in addition to her employment as a child care worker) she engaged in independent self-care, shopping, housecleaning, laundry, cooking, driving, and singing in a choir, and that she enjoyed visiting with friends, dancing, movies, music, television, eating out, and church activities. (R. 119-123, 197, 278-280, 286, 309). Ms. Harris testified she drives every day, although she had to take the test five times to renew her driver's license. (R 316). If someone calls her to go

out, she is generally "raring to go." (R. 119).

Testifying as an impartial vocational expert at Ms. Harris' second administrative hearing (R. 82-83, 324-326), Robin Stromberg was asked to consider the availability of work which an individual of Ms. Harris' age and having a marginal education[4] and no past relevant work experience[5] would be capable of performing consistent with an inability to perform more than simple, repetitive, one- and two-step tasks and a limitation to work at the light exertional level.[6] In response, Ms. Stromberg stated that the above-referenced limitations were consistent with the performance of a number of unskilled jobs which exist in significant numbers in the economy, and cited as examples the light exertional jobs of cashier (approximately 4,000 locally and 1,670,000 nationally), front desk recreation worker (1,600 locally and 150,000 nationally), and hand packer (4,000 locally and 34,000 nationally). (R. 324-325). Ms. Stromberg further testified that additional hand packer and cashier positions consistent with the expressed limitations existed in significant

---

[4]Marginal education is defined in 20 C.F.R. §§ 404.1564(b), 416.964(b) as follows:

Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

[5] Past relevant work experience is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. § 416.965(a); 20 C.F.R. § 404.1565(a).

[6]Light work is defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

numbers at the sedentary exertional level,[7] and that an individual having the specified limitations could additionally perform the sedentary job of general information clerk (1,100 locally and 37,000 nationally). (R. 325). Ms. Stromberg indicated that the need for frequent or prolonged rest periods would preclude the performance of the jobs cited. (R. 325). Ms. Stromberg stated that her testimony was consistent with the job descriptions contained in the Dictionary of Occupational Titles. (R. 325-326).

### III. ANALYSIS

The ALJ held that Ms. Harris was not under a disability within the meaning of the Social Security Act. The Court's review of this decision is limited to determining whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed.126 (1938)). It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting

---

[7]Sedentary work is defined in 20 C.F.R. §§ 404.1567(a), 461.967(a) as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. Richardson, 402 U.S. at 401.

Under Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984), a denial of benefits is not supported by substantial evidence if the ALJ "has not analyzed all evidence and . . . sufficiently explained the weight he has given to obviously probative exhibits." The issue before this Court, therefore, is not whether Ms. Harris is disabled, but whether the Commissioner's finding that Ms. Harris is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See id.

The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the

> inability to do any substantial gainful activity[8] by reason of any

---

[8] "Substantial gainful activity" is work that (1) involves doing significant and productive physical or mental duties and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510; 20 C.F.R. § 416.910. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572.

>
> medically determinable physical or mental impairment[9] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment"[10] which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[11] 20 C.F.R. § 404.1505(a); see also 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer

---

[9] "Physical or mental impairment" is defined in section 223(d)(3) of the Social Security Act, Title 42 U.S.C. § 423(d)(3), as an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

[10] The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c), 416.920(c).

[11] The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2. However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a vocational expert to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy. 20 C.F.R. § 416.920(f); § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 466, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983); SSR 83-10.

to question one or negative answers to questions two or four result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.

In this case, the ALJ addressed all five phases of the five-step evaluation process to determine whether Ms. Harris is disabled within the meaning of the Social Security Act. The ALJ first determined that Ms. Harris has not engaged in substantial gainful activity. (R.18).

The ALJ next found that Ms. Harris has borderline intellectual functioning and systemic lupus erythematosus ("lupus"), which cause significant vocationally relevant limitations and would be regarded as "severe" under the relevant guidelines. (R. 18). The ALJ found that Ms. Harris' depression was not a severe impairment. At the next step of the sequential analysis, the ALJ found that Ms. Harris' impairments did not, even in combination, meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 (or 20 C.F.R., Part 404, Subpart P, Appendix 1). (R. 18-21).

Fourth, based on the ALJ's evaluation of the evidence, the ALJ determined Ms. Harris' residual functional capacity.[12] (R. 21-22). The ALJ found that the evidence and testimony, as a

---

[12] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing residual functional capacity,

> the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Id. (footnote omitted.)

whole, reflect that Ms. Harris retains the residual functional capacity to perform a limited range of light work. (R. 22).

Ms. Harris had no past relevant work. Therefore, at the fifth step, the ALJ must decide whether there are jobs which Ms. Harris could perform considering her age, education, past work experience, and residual functional capacity. 20 C.F.R. § 404.1520(f). If Ms. Harris was capable of performing jobs, she must be found not disabled. 42 U.S.C. § 423(d)(2)(A). At this final step, the burden shifts to the Commissioner to demonstrate jobs that Ms. Harris would be able to perform. See Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983).

The ALJ elicited testimony from a vocational expert regarding Ms. Harris' ability to perform substantial gainful employment. (R. 324-26). The vocational expert testified that a person with the limitations described by the ALJ could perform work as a cashier, recreation worker or hand packer. (R. 324-25). The ALJ concluded that Ms. Harris could make an adjustment to other work and was, thus, not disabled. (R.23).

Ms. Harris argues that the Commissioner's decision is not supported by substantial evidence because the Commissioner improperly rejected the testimony of her treating psychologist, and improperly rejected Ms. Harris' testimony regarding her disabling condition.

### A. ALJ's Evaluation of the Medical Evidence

The ALJ performed a thorough evaluation of the medical evidence in the record. (R. 18-22). However, Ms. Harris asserts the ALJ failed to address the opinions of one of her treating doctors, Dr. Seltzer. Plaintiff's Memorandum p. 9. Robert Seltzer, Ph.D., of Norfolk Psychiatric Associates, P.C., counseled Ms. Harris from January through July of 2001, and referred Ms. Harris to a vocational rehabilitation program. (R. 196-201). While it is true that the ALJ does not mention Dr.

13

Seltzer by name, the ALJ's decision does refer to Dr. Seltzer's opinions and findings. (R. 18, 20). Further, Dr. Seltzer's notes and report are located at Exhibit 5F of the record, and the notes and reports are referenced by exhibit number in the ALJ's decision. (R. 18, 20).

Ms. Harris attempts to summarize Dr. Seltzer's opinions in her memorandum, stating: (1) Ms. Harris has a Global Assessment Score of 58 indicating she may have difficulty in social, occupational, and/or school functioning; (2) Ms. Harris suffers from diversions due to her depressed mood and insomnia; (2) Ms. Harris has borderline intelligence with a verbal IQ of 75, a performance IQ of 75, and a full scale IQ of 74; (3) Ms. Harris reads on a fifth or sixth grade level and has the mathematical abilities of a third grade child; and, (4) Ms. Harris becomes confused easily, frustrated quickly, and is unable to use more complex, abstract forms of reasoning, has a short attention span, and tends to give up quickly after a task [becomes frustrating]. Plaintiff's Memorandum pp. 10-12. Plaintiff concludes, "Dr. Seltzer confirmed that [Plaintiff's] fatigue, depression, lupus, and borderline intellectual functioning would interfere with her ability to work on a regular basis." Id. at 12.

Plaintiff has taken some liberties with Dr. Seltzer's notes and report contained in the record. First, Dr. Seltzer makes no reference in the record to Ms. Harris suffering from insomnia or fatigue. Secondly, Dr. Seltzer does not make any mention of Ms. Harris' suffering from lupus. Indeed, as pointed out in the Defendant's memorandum, Dr. Seltzer's last reported examination of Ms. Harris predated her diagnosis of lupus by Dr. Lee. (R. 197, 243).

A review of Dr. Seltzer's treatment notes reveals he diagnosed Ms. Harris with dysthymia, (a depressed mood), and borderline intellectual function. (R. 203). He reports Ms. Harris "will become confused easily, frustrated quickly, and unable to use more complex, abstract forms of

14

reasoning." (R. 200). Further, he notes her attention span is "rather short, and she tends to give up quickly after a task becomes frustrating." (R. 200-201). The notes indicate a gradual improvement in Ms. Harris' emotional state, and Dr. Seltzer's notes from Ms. Harris' last counseling session report she was "not depressed," had an "improved" mood, and "increased self-confidence." (R. 196-97). Dr. Seltzer encouraged Ms. Harris to find work, and referred Ms. Harris to vocational training at the Woodrow Wilson Rehabilitation Center. (R. 198-201).

The ALJ accurately referred to Dr. Seltzer's report in finding Ms. Harris suffers borderline intellectual functioning, has a short attention span, and is easily confused. (R. 18, 20). He also incorporated these findings into his determination of Ms. Harris' residual functional capacity. He referred to Dr. Seltzer's findings when reaching his conclusion that Ms. Harris is limited to performing simple, repetitive tasks. (R. 18, 20-22). This limitation adequately accounts for Dr. Seltzer's finding that Ms. Harris has a "rather short" attention span. See, e.g., Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002); Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) ("the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures Howard's [often having] deficiencies in concentration, persistence or pace").

Therefore, the ALJ properly considered Dr. Seltzer's opinion which is consistent with the ALJ's findings.

### B. ALJ's Findings Regarding the Testimony

In reaching a conclusion about Ms. Harris' residual functional capacity, the ALJ considered Ms. Harris' testimony, and that of her mother, regarding Ms. Harris' limitations and her daily activities. Ms. Harris claims the ALJ improperly rejected her subjective complaints of disabling limitations, and "culled the evidence to suit his favor." Plaintiff's Memorandum pp. 13-14. Ms.

Harris refers to her mother's testimony that she fails to complete tasks, is fatigued all the time, does not drive at night, has trouble staying awake, and spends entire afternoons sleeping. Id.

It is true, the ALJ "cannot 'pick and choose' only the evidence that supports his position." Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000); see also Switzer v. Heckler, 742 F.2d 382, 385 (7th Cir. 1984) (explaining that the "attempt to use only the portions favorable to [the secretary's] position, while ignoring other parts, is improper."). However, the Regulations make clear that a claimant's own subjective statements of her symptoms "are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528(a). The ALJ must evaluate all of the evidence when making his determination, and it is clear from the record that the ALJ did so in this case.

The record does not contain any medical opinion finding Ms. Harris unable to perform simple repetitive work at a light exertional level. Dr. Lee, Ms. Harris' rheumatologist, opined that Ms. Harris' lupus was "quiet," and, with few exceptions, her physical examinations were normal. (R. 232-241). Ms. Harris complained of fatigue on one occasion in July of 2002, and admitted she had not taken her medication since the preceding visit. (R. 236). During all other examinations, she denied any fatigue. (R. 232-241). Ms. Harris complained of right knee pain on three occasions, and a little stiffness in her right arm on one occasion, but reported no other symptoms. (R. 232, 234, 235, 241). Dr. Seltzer, Ms. Harris' psychologist, advised her to seek employment, and referred her to a vocational rehabilitation program. (R. 198-99). Further, the state agency physicians and psychologists reviewing Ms. Harris' record, found Ms. Harris capable of performing simple repetitive work at a light exertional level.

Ms. Harris worked for the YMCA for five 30 hour weeks in the spring of 2003, and was hoping to return when the program began again in the fall. (R. 148-155, 306, 309, 317). Further, Ms.

16

Harris testified she is able to take care of herself, and described her daily activities as including housecleaning, laundry, cooking, driving, dancing, socializing with friends, eating out, and singing in the choir. (R. 119-123, 197, 278-280, 286, 309). The ALJ must consider daily activities when making a determination about disability. See Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996); Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).

The ALJ properly considered Ms. Harris' subjective complaints of disabling limitations in conjunction with her medical record and reported daily activities. The ALJ concluded:

> [t]he claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the lack of need for aggressive treatment for her lupus, in light of her child care activity, which indicates she can perform some simple work activity, and in light of her description of her daily activities and the records from her treating physician, which do not support her description of fatigue.

(R. 21). Deference is owed to the ALJ's credibility determinations, especially with respect to Ms. Harris' subjective allegations. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

There is significant evidence in the record to support the ALJ's finding and the Commissioner's decision that Ms. Harris is not disabled.

## IV. RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be AFFIRMED.

## V. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28

U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984), cert. denied, 474 U.S. 1019 (1985); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

/s/
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia

May 12, 2005

## **CLERK'S MAILING CERTIFICATE**

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

John H. Klein, Esq.
Montagna, Klein & Camden, L.L.P.
425 Monticello Ave.
Norfolk, VA 23510

Susan L. Watt, Esq.
Office of the United States Attorney
101 West Main Street
Suite 8000
Norfolk, VA  23510

                                                Elizabeth H. Paret, Clerk


                                    By _____
                                            Deputy Clerk

                                                May      , 2005